**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

Everett Frazier, Commissioner,
West Virginia Division of Motor Vehicles,
Respondent Below, Petitioner

vs.) No. 20-0363 (Mason County 16-AA-109)

James R. Windle,
Petitioner Below, Respondent

## MEMORANDUM DECISION

Petitioner Everett Frazier, Commissioner, West Virginia Division of Motor Vehicles (the "Commissioner"), by counsel Janet E. James, appeals the Circuit Court of Mason County's March 12, 2020, order reversing the December 1, 2016, decision of the Office of Administrative Hearings ("OAH"), which concluded that respondent committed the offense of driving a motor vehicle under the influence of alcohol and affirmed the Commissioner's order of revocation and order of disqualification entered on July 16, 2013. Respondent James R. Windle, self-represented litigant, did not file a response.

This Court has considered the Commissioner's brief and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. This case satisfies the "limited circumstances" requirement of Rule 21(d) of the Rules of Appellate Procedure and is appropriate for a memorandum decision rather than an opinion. For the reasons expressed below, the decision of the circuit court is reversed, and this case is remanded to the circuit court for entry of an order consistent with this decision.

Respondent was arrested for driving under the influence ("DUI") on June 29, 2013, at a sobriety checkpoint conducted by the Mason County Sheriff's Department and Point Pleasant Police Department. Following receipt of the order revoking his driver's license and the order disqualifying him from driving a commercial vehicle, respondent submitted an objection to the revocation order and sought a hearing before the OAH. Respondent provided notice of his intent to challenge the lawfulness of the sobriety checkpoint, among other things.

Respondent's hearing before the OAH was held on January 15, 2015. Corporal Jason Gilley, a deputy sheriff with the Mason County Sheriff's Department who coordinated the sobriety checkpoint at which respondent was arrested, testified regarding the various "steps you have to take" to conduct a sobriety checkpoint. The first step is to obtain "an authorization to conduct the

1

DUI checkpoint. That one's getting the authorization from your sheriff." Corporal Gilley produced the authorization signed by Mason County Sheriff Greg Powers, and it was entered into evidence. The authorization outlined the plan for the sobriety checkpoint, and it provided that every vehicle would be stopped "unless volume created an unnecessary delay for motorist[s] or created a hazardous condition for motorist[s] or police officers." "You also have to have a DUI checkpoint approval through your prosecuting attorney," Corporal Gilley continued, and he produced "the letter of approval by Prosecuting Attorney Craig Patterson" demonstrating his compliance with this step, which was also entered into evidence. Another step is to provide "[t]he media notification of the sobriety checkpoint, which I type this out and have [Sheriff] Powers . . . sign it, and then I fax this to the media for them to publish it. I fax it to the radio station, local radio station, and the [local newspaper]." The "Media Notification of Sobriety Checkpoint" was entered into evidence, and Corporal Gilley testified that he "got the fax confirmation, copies of the fax confirmations that were sent" following his submission of that notice to media outlets. The fax confirmation sheet for the transmission to the radio station and newspaper were likewise admitted into evidence, and Corporal Gilley testified that the confirmation sheets state "the result, completed, and there was no error on the transmission of the media notification." He further testified that he completes "a detailed sketch of where the checkpoint is going to be, and also . . . get[s] on Google Map[s] and print[s] off exactly where the checkpoint is going to be so we can use this to coincide the exact place that it's going to be." The sketch and photo from Google Maps are used together to show the checkpoint is planned in such a way that "we don't get none of our guys hit. Another thing it shows that it's in a location where there's an alternative route to go around the checkpoint." The sketch and photo were admitted into evidence. In addition, in setting up the checkpoint, signs are placed before the checkpoint to allow drivers to take the alternate route, and signs are placed advising drivers generally of a sobriety checkpoint and cautioning them to slow down. Corporal Gilley testified that he was present "when they set up" the sobriety checkpoint and "when we t[ore] it down," and he oversaw the officers during the operation of the checkpoint. The hearing examiner asked Corporal Gilley if he had "a copy of the policies and procedures the sheriff's department has adopted regarding checkpoint operations?" Corporal Gilley stated that he did not.

On cross-examination, respondent's then-counsel asked Corporal Gilley if he had "any evidence or any documentation today to show that the papers notified you back and said, 'We actually published this'?"[1] Corporal Gilley responded that he "actually audibly heard it on the radio station. I heard that myself. The paper, I do not—I didn't clip out the clipping."

Chief Deputy David Downing of the Mason County Sheriff's Department testified that he initiated the stop of respondent's vehicle at the sobriety checkpoint. Respondent was observed to be driving his vehicle "very slow[ly]" and in an "unsteady" manner, and he nearly struck cones and a parked vehicle at the checkpoint. Chief Deputy Downing noted the smell of alcohol on respondent's breath and that respondent's eyes were red and glassy, and respondent admitted to having consumed alcohol. The officer further noted that respondent was unsteady as he exited his vehicle and while walking along the roadside. Chief Deputy Downing administered the horizontal gaze nystagmus, walk and turn, and one leg stand field sobriety tests, all of which respondent failed. Respondent's later-administered secondary chemical test of the breath showed a blood

---

[1] Below and early in the appeal proceedings, respondent was represented by counsel. Counsel moved to withdraw, and this Court granted counsel's motion on July 31, 2020.

alcohol concentration of 0.086 thousandths of one percent, by weight.[2] In a post-arrest interview, respondent admitted that he was under the influence of alcohol and that he had consumed three or four beers.

During respondent's closing argument, he moved to dismiss the disqualification and revocation, arguing that his arrest was unlawful because

> the substantial paperwork that is in evidence that is not here today and that [Corporal Gilley] could not present was the fact that it [notice of the sobriety checkpoint] was actually published. He sent the request in to have it published, and he testified to the fact that there was a transmittal; that the transmittal of the fax was proper, but there was no evidence here that the actual publication was made.

The OAH did not rule on respondent's motion to dismiss at the hearing, but in its final order, it denied his motion, finding that respondent produced no caselaw, and the OAH was unaware of any, holding "that the validity of a sobriety checkpoint is dependent upon the media actually disseminating that information." In fact, the OAH reasoned, "it would appear to be rather self-evident that a law-enforcement agency or police officer would not have the authority to require a newspaper, radio station, television station, etc., to print or broadcast anything." The OAH affirmed the order of revocation and order of disqualification.

Respondent filed a "Petition for Administrative Appeal" in the circuit court. Respondent argued that

> [a]t the hearing, the investigating officer failed to provide evidence that the proper procedures for conducting the sobriety checkpoint were followed, specifically, the officer could only testify that the facsimile for publication was sent to the newspaper. The officer could not provide *any* evidence that the sobriety checkpoint was actually published to the public.

And, although "[t]he officer testified that he had received the facsimile from where he had *requested* publication," respondent asserted that the officer "offered no evidence that publication was actually made of the sobriety checkpoint."

The circuit court found that "a facsimile transmission completion report does not prove that the notification of the checkpoint was actually broadcast and/or published by the media outlets" and that Corporal Gilley "can and should be expected to know whether the checkpoint was properly established and, particularly, whether proper and sufficient notice was given to the public so as to not improperly intrude on the rights of motorists." Because Corporal Gilley "did not take sufficient steps to confirm [that] the media outlets he contacted . . . did, in fact, publish his submitted notice of the checkpoint to the public," the court found that there was insufficient evidence that the Sheriff's Department followed its predetermined operational guidelines for

---

[2] The secondary chemical test of the breath was performed by Deputy Sheriff Stephen L. Green of the Mason County Sheriff's Department, who also testified before the OAH about his administration of that test.

3

conducting a sobriety checkpoint. The court acknowledged that "there may be no legal precedent establishing that a notice of a planned sobriety checkpoint actually be published by local media outlets," but it pointed to the requirement that checkpoints be "conducted within predetermined operational guidelines." And "[t]he only way to answer [the] question [of whether notification is sufficient or whether publication must be confirmed] is to see a copy of the operational guidelines to determine what the requirement is: Notification or notification and publication?" Therefore, the court continued, showing that the checkpoint was conducted within predetermined guidelines "would necessarily include the production of those written guidelines." In short, the court found "no evidence that the checkpoint was conducted within the predetermined operational guidelines of the Sheriff's Department because a copy of those guidelines was never produced." Finding insufficient evidence that the checkpoint constituted a valid investigative stop, the court reversed the OAH's final order affirming the orders of revocation and disqualification.[3] This appeal followed.

> On appeal of an administrative order from a circuit court, this Court is bound by the statutory standards contained in W.Va. Code § 29A-5-4(a) and reviews questions of law presented *de novo*; findings of fact by the administrative officer are accorded deference unless the reviewing court believes the findings to be clearly wrong.

Syl. Pt. 1, *Frazier v. Fouch*, 244 W. Va. 347, 853 S.E.2d 587 (2020) (citation omitted). Additionally, "where the circuit court has [reversed] the result before the administrative agency, this Court reviews the final order of the circuit court and the ultimate disposition by it of an administrative law case under an abuse of discretion standard and reviews questions of law *de novo*." *Id.* at --, 853 S.E.2d at 587, Syl. Pt. 2, in part (citation omitted).

The Commissioner raises two assignments of error on appeal, both of which pertain to the circuit court's rulings concerning the sobriety checkpoint. In his first, the Commissioner argues that the court incorrectly concluded that there was insufficient evidence of a valid checkpoint—and, in turn, a valid arrest—due to Corporal Gilley's failure to "take sufficient steps to confirm with the media outlets he contacted that they did, in fact, publish his submitted notice of the checkpoint to the public." The Commissioner argues that this is factually incorrect, as the officer confirmed publication, and that, in any event, proof of publication is not essential to a constitutionally valid checkpoint. In his second assignment of error, the Commissioner argues that the court erred in finding that establishing that the checkpoint was conducted within the predetermined operational guidelines "necessarily include[s] the production of those written guidelines in order for the OAH to make a proper determination as to whether those guidelines had been followed."

---

[3] The findings regarding respondent's intoxication are not in dispute. His challenge to the revocation and disqualification orders centered on the administration of the sobriety checkpoint as, "[u]nder this Court's precedent, a person cannot be considered lawfully arrested for DUI, as a prerequisite to the administrative revocation of the person's driver's license, unless the underlying traffic stop was legally valid." *Reed v. Pettit*, 235 W. Va. 447, 451, 774 S.E.2d 528, 532 (2015).

4

In addressing the lawfulness of sobriety checkpoints, we have previously held that "[s]obriety checkpoint roadblocks are constitutional when conducted within predetermined operational guidelines which minimize the intrusion on the individual and mitigate the discretion vested in police officers at the scene." Syl. Pt. 1, *Carte v. Cline*, 194 W. Va. 233, 460 S.E.2d 48 (1995). To prove compliance with the guidelines, the guidelines need not be produced in every instance, however. To be sure, "the DMV must be prepared to present testimony *or* other evidence of compliance with sobriety checkpoint guidelines." *Reed v. Zipf*, 239 W. Va. 752, 755, 806 S.E.2d 183, 186 (2017). "But we have never said that the DMV is required to present *both* testimony *and* documentary evidence, such as the written guidelines, merely because a driver notifies the DMV he or she may challenge the sobriety checkpoint guidelines at the OAH hearing." *Id.* Thus, taking the Commissioner's assignments of error out of order, we address the second and find that the circuit court erred in concluding that the Commissioner was required to produce the written guidelines. Instead of documentary evidence, the Commissioner permissibly offered Corporal Gilley's testimony regarding the guidelines and his, the Mason County Sheriff's Department's, and Point Pleasant Police Department's compliance with those guidelines. Respondent did not request to review the guidelines, nor did he contest Corporal Gilley's testimony regarding compliance with the guidelines. Accordingly, there was no requirement that the written guidelines be produced.

We also agree with the Commissioner that the circuit court erred in finding that the checkpoint was invalid due to Corporal Gilley's purported failure to confirm publication of the notice of the checkpoint. In sum, the court found that without producing the written guidelines to establish whether "[n]otification or notification and publication" was the standard, the Commissioner could not prove that the sobriety checkpoint was conducted "within predetermined operational guidelines." *Carte*, 194 W. Va. at 234, 460 S.E.2d at 49, Syl. Pt. 1, in part. But we have found that a sobriety checkpoint may be valid though officers did not wholly comply with predetermined guidelines, so even if it is assumed here that the checkpoint was not conducted within predetermined guidelines, the inquiry into the validity of the checkpoint does not end.

Specifically, in *Pettit*, the lower tribunals reversed Mr. Pettit's driver's license revocation because, in contravention of department guidelines, the police chief failed to obtain approval for the checkpoint from the prosecuting attorney, the checkpoint was moved from its originally scheduled and publicized location without notice to the public of the change, and only five officers worked the checkpoint instead of seven. 235 W. Va. at 450, 774 S.E.2d at 531. On appeal to this Court, we found, first, that

> the police department's violations of its guidelines for sobriety checkpoints did not amount to per se violations of the federal or state constitutions or other laws of this State. The Supreme Court has never held that the federal constitutional requires that a county prosecutor approve a sobriety checkpoint before the checkpoint is conducted, that a checkpoint cannot be moved after it is publicly announced to be held at a specific location, or that a specific number of police officers must work a sobriety checkpoint. In addition, this Court is unaware of any statute or State rule that contains these requirements, and this Court never has held that the predetermined guidelines governing sobriety checkpoints must contain these requirements.

*Id.* at 454, 774 S.E.2d at 535. Having found that the violated guidelines in *Pettit* were not required under state law or the state and federal constitutions, we proceeded to determine the lawfulness of the checkpoint by applying the balancing test set forth in Syllabus Point 6 of *State v. Sigler*, 224 W. Va. 608, 687 S.E.2d 391 (2009), which requires that

> [i]n evaluating the lawfulness of a suspicionless seizure, a balancing of interests should be considered to determine if such a seizure is permissible under the United States Constitution and the Constitution of West Virginia[,] . . . and these factors should be considered: (1) the gravity of the public concern that is being addressed or served by the checkpoint; (2) the degree to which the checkpoint is likely to succeed in serving this public interest; and (3) the severity with which the checkpoint interferes with individual liberty.

And, "in assessing the lawfulness of checkpoints we principally are concerned with the reasonableness both of the degree of discretion exercised by police officers in operating the checkpoint and the intrusion into the privacy of individuals who are stopped at the checkpoint." *Pettit*, 235 W. Va. at 454, 774 S.E.2d at 535; *see also id.* at 448, 774 S.E.2d at 530, Syl. Pt. 6 ("The court's obligation in weighing these [*Sigler*] factors is to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field.") (citation omitted). Under these standards, we concluded in *Pettit* that the police department's deviations from its guidelines "did not result in the unreasonable exercise of discretion by the officer in charge of the checkpoint," that the sobriety checkpoint was legally valid, and that the driver's arrest for DUI at that checkpoint was, therefore, lawful. *Id.* at 455, 774 S.E.2d at 536.

In addressing the checkpoint at issue here under these standards, we note at the outset that, like in *Pettit*, there is no state law or state or federal constitutional requirement that an officer confirm publication of the notice of the checkpoint. We further find that Corporal Gilley's testimony established that the checkpoint was conducted in substantial, if not complete, compliance with department guidelines. Corporal Gilley testified that he obtained approval from the prosecuting attorney to conduct the checkpoint, provided notice to the media for publication, conducted the checkpoint at a location with an alternate route so that motorists could avoid the checkpoint, and erected signage alerting motorists to the checkpoint.[4] Further, unless the volume of cars created an unreasonable delay or hazardous condition, the officers planned to stop every vehicle at the checkpoint. Notably, there was no evidence that any such failure to confirm publication of the notice resulted in the checkpoint having been operated unreasonably in terms of the amount of discretion exercised by the officers or the intrusion into the motorists' privacy. Accordingly, we find that the checkpoint at which respondent was stopped was lawful, as was his subsequent arrest for DUI.

For the foregoing reasons, we reverse and remand this case to the circuit court to enter an order affirming the decision of the OAH and reinstating the Commissioner's revocation and

---

[4] We also observe that, in effect, Corporal Gilley confirmed publication when he heard notice of the checkpoint over the radio.

disqualification orders. To facilitate the commencement and conclusion of the remand proceedings, we direct the Clerk of this Court to issue the mandate of this Court contemporaneously with the issuance of this decision.

Reversed and remanded.

**ISSUED:**  September 27, 2021

**CONCURRED IN BY:**

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton